## THE CARRIE L. TYLER.

(Circuit Court of Appeals, Fourth Circuit. February 7, 1901.)

No. 385.

PILOTS—TENDER OF SERVICES—RIGHT TO COMPENSATION—BARGE IN TOW.

The fact that a vessel is without motive power of her own, and is in tow of a tug having on board a licensed pilot, does not relieve her from the duty of taking a pilot, where all vessels of her tonnage and draught are required by a state statute to have a licensed pilot; and under Code N. C. §§ 3496, 3502, 3505, which require all vessels over a certain tonnage, whose master or first mate is not a licensed pilot, to take a pilot in crossing the bar at the mouth of the Cape Fear river, and authorize the recovery of pilotage by any licensed pilot whose services are offered and refused, a barge of the requisite tonnage is liable for such pilotage although she is without propelling power, and in tow of a tug, whose master is a licensed pilot.

Appeal from the District Court of the United States for the Eastern District of North Carolina, at Wilmington, in Admiralty.

"The barge Carrie L. Tyler has been employed in carrying phosphate rock from the port of Charleston, S. C., to the port of Wilmington, N. C. Her tonnage is 565 tons gross, 503 tons net. She is enrolled at Charleston. She draws 18 feet. This barge carries two low masts, with a spread of sails used to steady her at sea, but entirely incapable of propelling her; and, in fact, she is without any propelling power whatever. When she was towed towards the mouth of Cape Fear river, she was taken in tow by the tug Alexander Jones, a regular coastwise steam tug. The master of this tug and her first mate are both duly licensed as branch pilots for the Cape Fear river and bar. The libelant is a duly-licensed pilot of the Cape Fear river and bar. On three separate occasions while on his cruise he saw the Carrie L. Tyler proceeding towards and crossing the bar of the Cape Fear river, and on each occasion proffered his services as pilot to her. On each occasion his proffer was refused. He thereupon filed his libel in rem against the said barge, demanding the fee to which he would have been entitled had he piloted the barge. Under the law of North Carolina the pilot fees for all vessels drawing 18 feet is $143, except coastwise vessels. These are entitled to a discount of 25 per cent., leaving $107.25. For the three occasions he demands $321.75. The answer denies all liability to libelant on the facts stated. The district court disallowed the claim, and dismissed the libel. 103 Fed. 326.

The statutes of North Carolina under which libelant claims are as follows:

"Sec. 3496. When the Master of Vessel Need not Take Pilot. 1858-'9, c. 23, § 8. No master of a vessel shall be required to take or keep a pilot on board or pay for pilotage in the river or over bars, who is or has been a full branch pilot, or employs a full branch pilot as first mate of his vessel."

"Sec. 3499. Rights of Pilots as to Main and New Inlet Bars of Cape Fear. R. C., c. 85, § 11; 1797, c. 486, § 1. The pilots having branches to pilot over the Main bar, or New Inlet bar, of Cape Fear river, shall be entitled to pilot and navigate vessels into port over either bar; and the pilot who shall bring a vessel into port over either bar shall be entitled, exclusively, to navigate the same vessel out of port over either bar; provided, when any vessel shall be ready to go out of port, and such pilot does not attend to navigate the same, the captain or master may employ any other pilot for that purpose, such other pilot being a branch or commissioned pilot for the bar over which the vessel is to be navigated out; and every pilot who shall navigate a vessel out of

port contrary to this section shall for every such offence forfeit and pay forty dollars to the pilot or pilots, who, by this charter, would have been entitled to navigate said vessel out of port."

"Sec. 3502. Pilots Refused, Entitled to Full Pilotage. R. C., c. 85, § 14; 1784, c. 207, § 8. When any master of a vessel, not having a pilot on board, coming over the bar into the Cape Fear river; or being in the river and going out of either of the inlets, shall refuse a pilot across the bar, then each pilot so refused shall be entitled to the same pilotage as if he had been actually employed to pilot, and had piloted such vessel."

"Sec. 3503. One-Third Fees to be Paid to Pilots in Certain Cases. R. C., c. 85, § 15; 1786, c. 262, § 6. When any vessel shall come over the bar before a pilot boards her, she shall pay only one-third fees for coming in, unless when it may happen the weather is so bad that no person can board a vessel, in which case, if he shall hail her without the bar, he shall be entitled to full fees."

"Sec. 3505. Pilot Entitled to Full Pay though Refused, When. R. C., c. 85, § 17; 1813, c. 866; 1823, c. 1222, §§ 1, 2; 1831, c. 65; 1840, c. 48; 1856-57, c. 1. When a master of a vessel shall refuse a pilot either up or down the Cape Fear river, then each pilot so refused shall be entitled to the full pilotage in the same manner as he would have been had he been actually employed for the purpose of piloting such vessel. But any vessel under sixty tons burden shall not be compelled to take a pilot while crossing the bar, or pay pilotage, except where signals are made for a pilot: and no vessel coming in at either of the said inlets with a view to the more convenient prosecution of her voyage, or to make a harbor, shall be subject to the payment of pilotage."

Thomas Evans, for appellant.

George Rountree, for appellee.

Before GOFF and SIMONTON, Circuit Judges.

SIMONTON, Circuit Judge (after stating the facts as above). No objection has been or can be made to the jurisdiction of the court below. Hobart v. Drogan, 10 Pet. 120, 9 L. Ed. 363. Nor can any objection be made to the provision of the law giving a pilot the same fees for services tendered and refused as he would have earned if the services had been accepted and performed. Cooley v. Board, 12 How. 299, 13 L. Ed. 996. The sole question in the case is this: Was this barge, being wholly without motive power of any kind, bound by law to accept the services of a pilot while she was in tow of a steam tug, whose master was a licensed pilot of the bar and river over which she was navigating? The point is a narrow one. It is a municipal regulation of the state of North Carolina, recognized and made of force under the legislation of congress. Cooley v. Board, supra. No decision of any court in that state has been quoted, and none can be found, bearing on this question. It comes up for the first time for adjudication. The class of pilots has existed from the earliest times, and laws have been enacted in every nation engaged in commerce regulating and protecting them. The purpose of these laws is to insure at all times a due supply of men well qualified by skill, knowledge, and experience to protect vessels entering into ports and harbors from the dangers of navigation. They are engaged in a perilous calling, and must be ready to brave the perils of their vocation. To encourage such men, and to secure permanence in their ranks, every nation engaged in commerce, and all the states in the Union having harbors, have enacted laws making it compulsory upon all vessels entering their ports, except those of very small tonnage, to employ a duly-licensed pilot for the purpose of piloting them.

The propriety and legality of these regulations by the states have been sanctioned by the supreme court of the United States. Steamship Co. v. Joliffe, 2 Wall. 450, 17 L. Ed. 805; Wilson v. McNamee, 102 U. S. 572, 26 L. Ed. 234. And these cases also sustain the regulation that if a pilot offer his services, and they be refused, he is entitled to be paid the pilotage, unless some other pilot be first engaged. Mr. Justice Curtis, in Cooley v. Board, 12 How. 312, 13 L. Ed. 1002, speaking on this subject, says:

'We think this particular regulation concerning half-pilotage fees is an appropriate part of a general system of regulations of this subject. Testing it by the practice of commercial states and countries legislating on this subject, we find it has usually been deemed necessary to make similar provisions. Numerous laws of this kind are cited in the learned argument of the counsel for the defendant in error; and their fitness, as part of a system of pilotage, in many places, may be inferred from their existence in so many different states and countries. Like other laws, they are framed to meet the most usual cases. 'Quæ frequentius accidunt.' They rest upon the propriety of securing lives and property exposed to the perils of a dangerous navigation by taking on board a person peculiarly skilled to encounter or avoid them; upon the policy of discouraging the commanders of vessels from refusing to receive such persons on board at the proper times and places; and upon the expediency, and even intrinsic justice, of not suffering those who have incurred labor, and expense, and danger, to place themselves in a position to render important service generally necessary, to go unrewarded, because the master of a particular vessel either rashly refuses their proffered assistance, or, contrary to the general experience, does not need it. There are many cases in which an offer to perform, accompanied by present ability to perform, is deemed by law equivalent to performance. The laws of commercial states and countries have made an offer of pilotage service one of those cases; and we cannot pronounce a law which does this to be so far removed from the usual and fit scope of laws for the regulation of pilots and pilotage as to be deemed, for this cause, a covert attempt to legislate upon another subject under the appearance of legislating on this one."

This compulsion exists on the masters of all vessels, notwithstanding that they themselves, by frequent visits to the port, may possess sufficient knowledge to cross the bar and navigate the rivers in safety. In every case the language is general,—"every ship or vessel." The North Carolina statute says:

"When any master of a vessel, not having a pilot on board, coming over the bar of Cape Fear river or being in the river and going out either of the inlets, shall refuse a pilot across the bar, then each pilot so refused shall be entitled to the same pilotage as if he had been actually employed to pilot and had piloted such vessel."

An examination of the regulations will disclose that the rates of pilotage are fixed by the draught of the vessel, and upon all vessels alike,—steam or sail vessels. The appellee claims that the barge in the case at bar was exempt from this regulation of the statute for two reasons: First, because she had no motive power in herself, and therefore could not be navigated by a pilot; second, because the tug already had on board of her a duly-licensed pilot of the bar and river of the Cape Fear. It is true that the barge had no motive power in herself, but she supplied motive power when she engaged the services of the tug. She then began to be navigated, and by her great draught of 18 feet she encountered the dangers of the shoals and narrows of the bar and river. A vessel with all her sails furled has no power of locomotion, and in tow of a tug is absolutely depend-

ent upon it; yet in no instance in any port is a vessel in this condition exempted from taking a pilot simply because she is in tow of a tug. A tug is engaged in the service of towage. This is her contract, and that is all for which she can be held responsible. "The parties to this contract contemplate risk in the performance of it,—the risk of winds and waves, and of obstacles, floating or fixed, that lie about or in her path." Machlachan, Merch. Shipp. p. 286. But the pilot contracts to navigate the vessel safely through the narrow channels of the bar and river; a danger not seen, and only known by long observation and experience. So distinct are the duties of the tow and of the pilot that Dr. Lushington always held that the tug was subservient to and must obey the pilot on the vessel in tow. The Energy, L. R. 3 Adm. & Ecc. 52. But the appellee contends that, as the tug had on board, in her master, a regularly licensed pilot, no pilot was needed for the vessel. But the law is imperative. A vessel must have a pilot, whether she needs one or not; and this to secure compensation to the privileged class of pilots. As has been said, very many ship masters, by frequent visits to ports, learn and know the channels. But this does not exempt them from employing a pilot. Gerrish v. Johnson, 46 N. C. 335. Again, the tug master was present, managing his tug, not as a pilot, not performing his duty as a pilot, and incurring liability as such, not charging or receiving compensation as a pilot, but engaged simply in the performance of his duty as tow master, and in fulfilling that, a wholly distinct, contract. The congress of the United States has passed an act which exempts coastwise seagoing steam vessels from compulsory pilotage if they be under the control and direction of a pilot licensed by the United States inspectors of steamboats. Rev. St. U. S. § 4444. But this section in its terms is confined to coastwise seagoing steam vessels, and under the rule, "Expressio unius exclusio alterius," no other class of vessels comes within this act. See Spraigue v. Thompson, 118 U. S. 95, 6 Sup. Ct. 988, 30 L. Ed. 115.

The evidence does not disclose whether the barge was towed by a line, or whether the tug was alongside of her. If the former mode of towing was used, it was necessary that the barge should have at her helm an experienced navigator, not only to enable her to follow the general direction of the tug, but also cognizant of the dangers of the channel, so as to keep clear of them. If the tug were alongside, her helmsman must exercise the same care and be possessed of the same knowledge. It is said, however, that the tug and tow are, in contemplation of law, one vessel, and that one under steam, thus giving to the combination the character of the tug. So they are for some purposes. They are governed by the international rules applicable to vessels approaching each other, and must observe the regulations applicable to steam vessels. The Civilta and The Restless, 103 U. S. 699, 26 L. Ed. 599. But they are so far distinct from each other that, if a collision takes place, the tug can be held liable to the exoneration of the tow. The James Gray v. The John Fraser, 21 How. 184, 16 L. Ed. 106. The rubric of that case is this: Although the tow was the res or thing which struck the brig and did the damage, that does not make her liable for the injury, unless the collision was occasioned by her fault. In the recent case of The Min-

nie, 40 C. C. A. 312, 100 Fed. 128, we held the tug responsible for a collision, exonerating the tow. It seems, therefore, that a tug and her tow are not one vessel, except under certain peculiar circumstances, such as approaching a vessel whose movements are not controlled by steam. The learned counsel for the appellee quotes and relies upon The Glaramara (D. C.) 10 Fed. 678. But that case depends upon the local law of Oregon. He also quotes Judge Lowell, in Flanders v. Tripp, Fed. Cas. No. 4,854. But in that case the vessel had encountered stress of weather, which had disabled her entirely. The master, leaving her in charge of the mate, had gone for assistance. Meanwhile a pilot boarded her for the purposes of salvage. The judge ruled that he could not, under these circumstances, compel her to accept his services, nor to pay him because of his tender of them. The language of Mr. Justice Grier, in Smith v. The Creole, Fed. Cas. No. 13,033, is not inappropriate to this case:

"As a general rule, masters of vessels are not expected to be, and cannot be, acquainted with the rocks and shoals on every coast, nor able to conduct a vessel safely into every port. Nor can the absent owners, or their agent, the master, be supposed capable of judging of the capacity of persons offering to serve as pilots. They need a servant, but are not in a situation to test or judge of his qualifications, and have not, therefore, the information necessary to a choice. The pilot laws kindly interfere, and do that for the owners which they could not do for themselves. It selects persons of skill and experience, and requires them to give bonds for the faithful performance of their duty; and if it should so happen in some particular cases that owners may not need the services of such pilot selected by law, it is but just that they should contribute to the support of a system instituted for their benefit."

We are of the opinion that the barge comes within the letter of the law, and that the court below should have found for the libelant. Let the case be remanded to the district court for such further proceedings as may be necessary. The decree of the district court is reversed, and the cause remanded to that court.